1  Byron Z. Moldo (SBN 109652)
     bmoldo@ecjlaw.com
2  Michael C. Lieb (SBN 126831)
     mlieb@ecjlaw.com
3  Faye C. Rasch (SBN 253838)
     frasch@ecjlaw.com
4  **ERVIN COHEN & JESSUP LLP**
   9401 Wilshire Boulevard, Ninth Floor
5  Beverly Hills, California 90212-2974
   Telephone  (310) 273-6333
6  Facsimile  (310) 859-2325

7  Attorneys for James H. Donell, Permanent Receiver

8

9              **UNITED STATES DISTRICT COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11

12                                          Case No. **CV12·4084** CBM (PLAx)

13  JAMES H. DONELL, as Permanent
    Receiver for NewPoint Financial        (Related to CV 10-0124-DDP(JEMx))
    Services, Inc.,
14                                          **COMPLAINT FOR BREACH OF**
              Plaintiff,                    **FIDUCIARY DUTY,**
15                                          **PROFESSIONAL NEGLIGENCE,**
       v.                                   **AND CONSTRUCTIVE FRAUD**
16
    NIXON PEABODY LLP,                      **[JURY TRIAL DEMANDED]**
17
              Defendant.                    Judge:  Hon. Hon. Dean D. Pregerson
18                                          Date:   n/a
                                            Time:   n/a
19                                          Crtrm.: 3

20                                          The Hon. Dean D. Pregerson

21                                          Discovery Cutoff:    Not Set
                                            Motion Cutoff:       Not Set
22                                          Trial Date:          Not Set

23

24

25

26

27

28

13390.10:1602511.1
_____
COMPLAINT FOR BREACH OF FIDUCIARY DUTY, NEGLIGENCE AND CONSTRUCTIVE FRAUD

ERVIN COHEN & JESSUP LLP

1   James H. Donell, in his capacity as Permanent Receiver ("Receiver" or

2   "Plaintiff") for NewPoint Financial Services, Inc. ("NewPoint"), hereby sues Nixon

3   Peabody, LLP ("Nixon Peabody"), and in support thereof, alleges the following on

4   information and belief, based on the sources identified below:

5       1.   Between 2007 and 2009, Nixon Peabody, which had been retained to

6   act as counsel to NewPoint, instead, aided, abetted, assisted and conspired with

7   NewPoint's President John Farahi ("Farahi") to loot the assets of NewPoint, to

8   cause NewPoint to violate the federal securities laws, and to attempt to conceal

9   Farahi's embezzlement of funds and NewPoint's numerous violations of the federal

10  securities laws.  Former Nixon Peabody partner David Tamman ("Tamman") is

11  under criminal indictment for his role in Farahi's fraud.  Seeking opportunities to

12  bill for services, Nixon Peabody entered into a conflicted representation in which it

13  was retained solely by NewPoint, but in fact acted on behalf of Farahi, knowing that

14  Farahi was diverting corporate funds and wasting corporate assets.  As more

15  particularly alleged below, Nixon Peabody acted negligently, breached the fiduciary

16  duties it owed to NewPoint, and constructively defrauded NewPoint.

17  **THE PARTIES**

18      2.   On February 17, 2010, in the action styled *Securities and Exchange*

19  *Commission v. Newpoint Financial Services, Inc., et al.* USDC Case no. CV 10-

20  0124-DDP(JEMx) ("Enforcement Action"), pursuant to the application of the

21  Securities and Exchange Commission ("SEC"), this Court entered its Order

22  Appointing Permanent Receiver, Extending Temporary Restraining Order, and

23  Continuing Hearing re Order to Show Cause re Preliminary Injunction

24  ("Receivership Order").  The Receivership Order appointed plaintiff James H.

25  Donell as the Permanent Receiver of NewPoint, Triple "J" Plus, LLC, and the

26  subsidiaries and affiliates of each.  [Enforcement Action, Dkt. 27].

27      3.   Under the Receivership Order, this Court bestowed on the Receiver the

28  full powers of an equity receiver, including the right and duty to pursue recovery of

ERVIN COHEN & JESSUP LLP

1   the losses of NewPoint, and to employ attorneys, accountants and others to
2   investigate, institute, pursue and prosecute all claims and causes of action of
3   whatever kind and nature that arise from the activities of present or past employees
4   or agents of NewPoint.  Pursuant to the powers in the Receivership Order, the
5   Receiver brings this suit on behalf of Newpoint against its former counsel Nixon
6   Peabody.

7          4.     Plaintiff is informed and believes and thereon alleges that Nixon
8   Peabody is a limited liability partnership that is present and does business in Los
9   Angeles County, California.  The claims alleged herein against Nixon Peabody arise
10  out of its representation of NewPoint, including its conflicted conduct on behalf of
11  Farahi in derogation of Nixon Peabody's fiduciary duties to NewPoint.

12                  **JURISDICTION, VENUE AND TIMELINESS**

13         5.     This Court has jurisdiction over the Enforcement Action pursuant to
14  sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933, 15 U.S.C. §§ 77t(b),
15  77t(d)(1) and 77v(a), and sections 21(d)(1),(21)(d)(3)(A), 21(e) and 27 of the
16  Securities Exchange Act of 1934, 15 U.S.C. §§ 78(u)(1), 78u(d)(3)(A), 78u(e) and
17  78aa.

18         6.     This Court has supplemental jurisdiction over this action pursuant to 28
19  U.S.C. § 1367(a) because the claims alleged herein are so related to claims in the
20  Enforcement Action that they form part of the case or controversy under Article III
21  of the United States Constitution.  *See also Donell v. Kowell*, 533 F.3d 762 (9th Cir.
22  2008).  In particular, this action involves the conduct of Nixon Peabody arising from
23  and related to the same series of transactions and events that are at issue in the
24  Enforcement Action, including Nixon Peabody's conduct in aiding and abetting the
25  conduct alleged therein.

26         7.     Venue is proper in this district, because this action is ancillary to the
27  Enforcement Action.  Venue further lies in this district because a substantial part of
28  the events and omissions giving rise to the claim occurred in this judicial district.  28

1   U.S.C. § 1391(b).

2       8.    This action is timely filed in accordance with a series of tolling

3   agreements executed between Nixon Peabody and Plaintiff, the last of which

4   permits the filing of this action on or before May 14, 2012.

5                              **UNDERLYING FACTS**

6   **A.    NewPoint's Retention of Nixon Peabody**

7       9.    On or about February 14, 2007, attorney Tamman joined Nixon

8   Peabody as a partner in its Los Angeles office.  *Source:*  Verified Complaint in

9   *Tamman v. Nixon Peabody, LLP,* LASC case no. BC471675 (hereafter, "Tamman

10  Complaint"), ¶ 6.  Tamman had previously been employed as Senior Counsel in the

11  Los Angeles law firm Liner Grode Stein Yankelevitz Sunshine Regenstreif &

12  Taylor LLP ("Liner").  *Id.* at ¶ 7.

13      10.   Shortly after Tamman joined Nixon Peabody, Farahi, acting as Chief

14  Executive Officer of NewPoint, executed a written "Agreement for Legal Services"

15  (hereafter, "Retainer Agreement") with Nixon Peabody.  Plaintiff has recovered

16  from an electronic production of documents produced by Nixon Peabody an

17  unsigned version of what he believes to be the final version of the Retainer

18  Agreement, dated March 7, 2007.  The date on the electronic version of the

19  document coincides with the date alleged in the Tamman Complaint (¶22); and the

20  authenticity of that document is further confirmed by an electronic version of a

21  March 8, 2007 letter from Tamman to Farahi stating that it encloses a duplicate copy

22  of a retainer agreement.

23      11.   The Retainer Agreement makes clear that NewPoint was to be Nixon

24  Peabody's only client for the services to be performed thereunder:

25          "Our sole client will be NewPoint Financial Services (hereinafter,

26          "you").  Our representation of you does not give rise to an attorney-

27          client relationship between us and any of your affiliates or constituents

28          (such as shareholders, partners, officers, directors or employees) and

ERVIN COHEN & JESSUP LLP

ERVIN COHEN & JESSUP LLP

1      you also agree that you will not give us confidential information

2      regarding your affiliates during the course of our representation of you.

3      Accordingly, our representation of you in this matter will not give rise

4      to any conflict of interest in the event one of our other clients is adverse

5      to any of your affiliates."

6  Plaintiff is informed and believes, and thereon alleges that the Retainer Agreement

7  was the sole contract governing the work performed by Nixon Peabody as alleged in

8  this Complaint.  Plaintiff is further informed and believes, and thereon alleges that

9  Nixon Peabody *never* executed a retainer agreement under which it agreed to

10  represent Farahi.  If Nixon Peabody intended to accept a representation of Farahi, it

11  would have been required to execute a written retainer agreement with him

12  personally.  *See,* Cal. Bus. & Prof. Code  § 6148.

13      12.    Based on the foregoing, Plaintiff alleges that Nixon Peabody was

14  retained solely by, and had an attorney-client relationship solely with, NewPoint.

15  Nonetheless, as alleged below, Nixon Peabody repeatedly disregarded its duty of

16  loyalty to NewPoint and actively assisted Farahi to embezzle NewPoint's funds and

17  to expose NewPoint to violations of the federal securities laws.

18      13.    Nixon Peabody's indifferent attitude to its duties to NewPoint is

19  exemplified by its present position: it has stated that it intends to defend this action

20  on the ground that Newpoint and Farahi should be treated as alter egos.  *Source:*

21  February 12, 2012 Letter of Russell G. Ryan ("[T]he receivership entities here are

22  nothing more than alter ego companies of the principal wrongdoer John Farahi.").

23      **B.**   **Nixon Peabody's Initial Work for NewPoint**

24      14.    Nixon Peabody wasted no time blurring the lines between its client,

25  NewPoint, and the persons and entities expressly identified in the Retainer

26  Agreement as non-clients.  On March 8, 2007, Tamman sent an email to Nixon

27  Peabody attorney Jenny Chen-Drake ("Chen-Drake") asking her to work on two

28  matters.  The first matter was to research Farahi's plan to use an entity called

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, NEGLIGENCE AND CONSTRUCTIVE FRAUD

NewPoint Mortgage Brokerage to raise $20 million to purchase mortgage loans for the purposes of foreclosing on real estate.  Tamman wrote: "He owns a mortgage broker (NewPoint Mortgage Brokerage) – I would like to know whether he should raise his $20 m via this or another vehicle (you will need to check the mortgage brokerage rules to see if this is acceptable).  Keep in mind he also owns a BD [broker-dealer] (which he does not want to use)[.]" *Source:*  March 8, 2007 email from Tamman to Chen-Drake.

15.    In that same March 8, 2007 email, Tamman noted that NewPoint had been selling debentures for several years and instructed Chen-Drake to assist "to determine whether he complies with the exemption."  Tamman stated:  "I think the exemption he is using is Rule 504."

16.    In fact, Tamman knew or should have known that Farahi solicited investments in NewPoint by way of a regular Farsi language radio program.  From that fact alone, Tamman should have recognized that NewPoint could not meet any of the "Reg. D" exemptions, including Rules 504, 505, or 506.  *See,* 17 CFR § 230.502(c) (making Reg. D exemptions unavailable as to any security subject to any form of general solicitation or advertisement).[1]

17.    Tamman, while employed by Liner, had also drafted a revised Private Placement Memorandum for NewPoint.  *Source:*  March 21, 2007 email from Tamman to Chen-Drake (attaching August 19, 2004 email from Tamman to Farahi).  Tamman's revised PPM extended the term of NewPoint's initial offering to April 30, 2006 (from May 1, 2005) and made other material revisions described more fully below.  *Source:*  March 21, 2007 email from Tamman to Chen-Drake

---

[1]    On April 29, 2009, Nixon Peabody received a transcript of the January 7, 2009 episode of "Economy Today," which was Farahi's regular radio program.  *Source:* April 29, 2009 email exchange among, *inter alia,* Tamman, Edward O'Callaghan and William Kelly.  In the transcript, Farahi repeatedly asks listeners to call NewPoint and provides the telephone number.

ERVIN COHEN & JESSUP LLP

1 (attaching November 29, 2004 email from Tamman to timatrnd@aol.com).

2      18.   The PPM revised by Tamman stated that NewPoint claimed an

3 exemption under Rule 506.  Whether the claimed exemption was under Rules 504,

4 505, or 506, NewPoint was required to file with the SEC a "Form D" within 15 days

5 of the first sale of securities.  *See,* 17 CFR § 230.503.  In fact, Farahi did file Form

6 D's on August 20, 2002, August 12, 2004, and September 16, 2009.  *Source:*

7 http://www.sec.gov/cgi-bin/browse-edgar.  Each claimed an exemption under Rule

8 506.

9      19.   To claim an exemption under Rule 506, an offering may be sold to no

10 more than 35 non-accredited investors; but even the non-accredited investors must

11 be sophisticated investors as defined in Rule 506(b)(2)(ii).  On March 12, 2007, and

12 again on July 25, 2007, Tamman received investor information from Elaheh Amouei

13 ("Amouei") acting on behalf of NewPoint.  Both broke down investors between "S"

14 and "NS" – apparent references to "sophisticated" and "not sophisticated"

15 categorizations of investors.  *Source:*  March 12, 2007 email from Amouei to

16 Tamman; July 25, 2007 email from Amouei to Tamman.  Rule 506 does not allow

17 sales to any unsophisticated investors.

18      20.   The PPM revised by Tamman also stated expressly, in two places, that

19 investor funds would not be used to make investments in securities.  *Source:*

20 November 29, 2004 email from Tamman to timatrnd@aol.com (PPM attached).

21 The August 12, 2004 Form D, however, discloses that approximately $8 million had

22 been raised to date and stated that, of the anticipated $20 million in proceeds to be

23 raised, $18 million would be used for "investments in securities" made through

24 officers, directors and affiliates.  A screenshot of the Form D follows:

25 ///

26

27

28

ERVIN COHEN & JESSUP LLP

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, NEGLIGENCE AND CONSTRUCTIVE FRAUD

ERVIN COHEN & JESSUP LLP



21.     The inconsistency between the PPM revision drafted by Tamman in November 2004 and the contents of the Form D should have clearly alerted Tamman (in 2004) that Farahi, at a minimum, was not operating NewPoint in a manner consistent with the PPMs.  Furthermore, not only would Tamman's knowledge have been imputed to Nixon Peabody when he became a partner in February 2007, but Nixon Peabody, independent of Tamman's knowledge, had before it clear evidence that the assets of its client, NewPoint, were being invested improperly.

22.     In fact, in its criminal indictment of Farahi and Tamman, a federal grand jury alleges that Tamman altered the original PPM while NewPoint was under investigation by FINRA, and that Farahi provided that altered PPM to FINRA in a successful effort to convince FINRA to terminate its investigation of NewPoint. *Source:  USA v. Farahi and Tamman,* USDC C.D. Cal. Case no. 11-1165(A)-PSG, April 25, 2012 Superseding Indictment (the "Superseding Indictment"), ¶¶ 25, 26. Just to summarize this episode, Tamman revised the PPM to state expressly that no funds would be used to purchase securities; he added that statement in two locations, one of which consisted of a table indicating that 45% of investor funds would be invested in mortgages; and he prepared that revision four months after Farahi filed a

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, NEGLIGENCE AND CONSTRUCTIVE FRAUD

1   Form D stating that $18 million of the $20 million expected to be raised would be
2   invested in securities through NewPoint's officers, directors, or affiliates.

3       23.     On March 8, 2007, when Tamman noted that Nixon Peabody needed to
4   determine whether NewPoint complied with the exemption it was using, Nixon
5   Peabody had before it ample evidence, noted above, that it did not.  Basic research
6   and a few questions to NewPoint's compliance officer would have disclosed that
7   NewPoint's offerings were not exempt under Reg. D., and that NewPoint was not
8   using the investor funds as represented in the PPMs.  If Nixon Peabody had done its
9   job (a basic task identified even by Tamman at the inception of the relationship in
10  March, 2007), it would have cut short by two years Farahi's looting of NewPoint
11  funds, and it would have ended NewPoint's continued violations of the federal
12  securities laws.

13      24.     Instead of looking into the exemption issue, instead of investigating
14  how and why the 2003 prospectus was revised to state expressly that Newpoint
15  funds would not be invested in securities, and instead of making any effort to
16  compare the PPM disclosures to one another or to the Form D on file with the SEC,
17  Nixon Peabody ignored the elephant in the corner of the room.  It moved forward
18  with work for Farahi, which included the drafting of a new PPM that included the
19  same exemption language that appeared in the existing PPMs.

20      25.     It was not until June, 2009, that someone asked a Nixon Peabody
21  associate to research the basic issue of whether the debentures constituted securities.
22  *Source:*  June 2, 2009 Memorandum from L. Lee to D. Tamman ("Lee Memo").
23  Tamman instructed Nixon Peabody not to produce this document in response to the
24  SEC's subpoena.  *Source:*  July 30, 2009 email from Tamman to Paul Phillips.[2]

25  _____

26  [2]    Ironically, one week after the Lee Memo was circulated, Nixon Peabody
27         partner Edward O'Callaghan suggested arguing that the NewPoint debentures
        were not securities.  Source:  June 9, 2009 email from Edward O'Callaghan to
28         (footnote continued)

ERVIN COHEN & JESSUP LLP

ERVIN COHEN & JESSUP LLP

26.     On or about March 19, 2007, Tamman submitted documentation to open files for NewPoint matters.  Nixon Peabody delayed opening any NewPoint matters until August 21, 2007 because Newpoint was only able to pay a retainer of $2,500.  That sum was below the firm's guidelines, and it also should have raised questions about a client that claimed to be managing millions of investor dollars. *Source:* June 28, 2007 email from Luella Crawford to Tamman.  Finally, on August 21, 2007, Nixon Peabody opened three matters opened for NewPoint as follows:  (1) General; (2) Corporate and (3) "Debenture Offering." *Source:* August 21, 2007 email from Anne Galipeau to Tamman and Luella Crawford.

27.     At this time, Plaintiff lacks information or belief to allege in full the acts of Nixon Peabody connected with the "Debenture Offering" matter.  Tamman alleges in his verified complaint that "Newpoint accounted for no billings while Plaintiff was at Nixon in 2007." *Source:* Tamman Complaint, ¶ 22.  That allegation appears to be false.  Nixon Peabody rendered invoices to NewPoint dated September 26, October 11, and November 14, 2007.  But for one time entry, it appears that all of Nixon Peabody's billings in 2007 related to work on revising the NewPoint PPM. *Sources:* September 26, 2007 Invoice (Matter 1); October 11, 2007 Invoice (matter 2); October 11, 2007 invoice (matter 3); November 14, 2007 invoice (matter 3).[3] None of the billing descriptions indicate that anyone at Nixon Peabody conducted any research into the issue of whether the NewPoint debentures qualified as exempt under Reg. D.

28.     Nixon Peabody emails show that the firm produced several draft PPMs

---

Tamman ("Perhaps his only argument then is that these were not securities, did not need a registration statement, and therefore he was not obligated to file.").

[3]  In total, Nixon Peabody billed NewPoint $6,405 for work during 2007 that, based on the general descriptions in the billing statements, appears related to revising the NewPoint PPM.

ERVIN COHEN & JESSUP LLP

1   in 2007 and provided some of the drafts to NewPoint.  Contrary to the time entries,

2   which reflect that Nixon Peabody was revising an existing PPM, the drafts show that

3   Nixon Peabody was working on a new offering, originally in the amount of $20

4   million, and subsequently increased to $30 million.  There is no evidence in the

5   Nixon Peabody files that anyone ever researched the issue of whether the new

6   offering of securities would be exempt under Reg. D, but the PPM drafts

7   nonetheless asserted that they would be exempt.

8        29.    Several drafts of the new PPM prepared by Nixon Peabody in 2007

9   contained a section titled "Prior Debt Offerings Effect [sic] Company's Ability to

10  Repay."  Under that heading, the PPM draft contained the following disclosure

11  (originally using blanks, but eventually filling in the dollar amounts):

12          "Over the past 7 years, the Company has raised a total of approximately

13          $27 million in debentures (the "Prior Debentures") through sales to

14          various investors.  To date, the Company has repaid approximately $17

15          million of principal and has made interest payments totaling

16          approximately $1.3 million on the Prior Debentures.

17          "The effect of the sales of the Prior Debentures could impact the

18          Company's ability to pay interest or repay principal on the Debentures

19          being sold in the current Offering, as such prior debt increases the load

20          of interest payments and principal debt owed by the Company to

21          investors."

22  *Source:* October 31, 2007 emails from Tamman to ntehrani@npstrade.com and

23  Farahi.[4]  Although Nixon Peabody understood the importance of NewPoint's prior

24  offerings to its financial condition, it still appears to have done nothing to determine

25  whether those offerings were made in compliance with Reg. D.

26  _____

27  [4]    This section was omitted from a later draft.  *Source:*  March 24, 2008 email
         from Tamman to Farahi.

28

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, NEGLIGENCE AND CONSTRUCTIVE FRAUD

30.     The disclosure quoted above should have set off alarm bells for another reason.  As alleged in paragraph 19, above, on March 12, 2007, Amouei sent Tamman a detailed report of "the bond's activities from the beginning up to present . . . ."  That report indicated that NewPoint had sold $45.5 million in debentures and had repaid $29 million in principal and $1.85 million in interest.  *Source:*  March 12, 2007 email from Amouei to Tamman.

31.     Based solely on the information it received in 2007, Nixon Peabody knew, or had the duty to know, the following: (i) that NewPoint's offerings did not qualify for any Reg. D exemptions because Farahi regularly solicited sales on his radio program; (ii) that there was serious doubt about the propriety of NewPoint's reliance on a Rule 506 exemption to raise investor funds due to NewPoint's apparent sales to unsophisticated investors; (iii) that, in direct contravention of the PPM under which those funds were raised, NewPoint's Form D disclosed that the proceeds raised by the PPM were used or to be used for investments in securities; (iv) although the Nixon Peabody knew that the circumstances and amounts of funds raised in prior debenture offerings directly affected the offering on which it was working, it had done no research to determine whether those prior offerings complied with Reg. D.; and (v) Nixon Peabody had received financial information about prior offerings from NewPoint, intended for use in the new PPM, that appeared to contradict information provided by Amouei several months earlier.

32.     In 2007, Nixon Peabody had in its hands all the information it required to prevent any further serious harm to its client, NewPoint.  The problem was that Nixon Peabody never viewed NewPoint as its client; it simply worked for Farahi.

**C.     Nixon Peabody Resumes Work in Late 2008.**

33.     Nixon Peabody continued working on a revised PPM in early 2008, and its work then appears to have stopped in March.  All the draft PPMs claimed that the offering would be exempt under Rule 506 and Reg. D, and there is no evidence that any Nixon Peabody attorney ever researched the accuracy of that representation.

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, NEGLIGENCE AND CONSTRUCTIVE FRAUD

ERVIN COHEN & JESSUP LLP

34.     As confirmed by the Receiver's accounting, during the fourth quarter of 2008, Farahi lost more than $30 million in risky futures trading using accounts in his wife's name. *Additional Source:* Superseding Indictment, ¶¶7(e), (g). He covered many of those losses with NewPoint funds – either directly or by borrowing against NewPoint assets.  While he was doing that, Nixon Peabody was busy trying to help him raise more money.

35.     In June 2008, again failing to recognize its commitment to represent only NewPoint, and, on information and belief without executing a new retainer agreement, Nixon Peabody agreed to assist Farahi to form a new hedge fund. *Source:* August 20, 2008 Nixon Peabody Invoice (Matter 2).  Nixon Peabody opened NewPoint matter no. 4, titled "Formation of Hedge Fund" on September 10, 2008. *Source:*  September 10 email from Anne Galipeau to Carole Gallegos and Barbara Laing (cc'd to Tamman and others).  Nixon Peabody partner William E. Kelly, Jr. and associate Matt Grazier were to handle the engagement. *Source:* September 11, 2008 email exchange among William Kelly, Philip Taub and Tamman.  Nixon Peabody apparently rendered one invoice, charging in excess of $11,000 for its hedge fund work, a portion of which Nixon Peabody wrote off in exchange for being retained in connection with the SEC's investigation of NewPoint and Farahi. *Source,* April 30, 2009 email exchange among Tamman, Philip Taub and James Black.

36.     In October, 2008, again acting as if Farahi were its client, Nixon Peabody drafted the documents necessary to form Parsi Investments, LLC ("Parsi"). The draft operating agreement and the Articles of Organization identify Farahi as the sole manager.  Sunny Lee, a Nixon Peabody paralegal, is listed as "Organizer" in Parsi's Articles of Organization.  It does not appear from the documents available to plaintiff that NewPoint was to have any role in Parsi, yet the work was done with NewPoint as client, and bills were rendered to NewPoint for Nixon Peabody's services in forming Parsi. *Sources:* November 25, 2008 Nixon Peabody Invoice

ERVIN COHEN & JESSUP LLP

1  (matter 1); Nixon Peabody "refined results" production, containing the draft

2  Operating Agreement.  Compounding the conflict, it appears that Parsi was formed

3  to invest in deeds of trust, the same investments that NewPoint supposedly was

4  making.  *Source:* October 23, 2008 email from Tamman to Farahi and others

5  (attachment) ("We were primarily formed for the purpose of making investments in

6  commercial paper and deeds of trust with a view to generating income and capital

7  appreciation for our members.").

8       37.     At or about the same time that Nixon Peabody was doing Farahi's

9  bidding by attempting to form a hedge fund and forming Parsi, which would

10  compete with NewPoint, Nixon Peabody learned that Farahi had lost between $7

11  and $11 million of NewPoint funds.  Tamman Complaint, ¶ 30.

12      38.     According to Tamman, at the same time that Nixon Peabody was

13  working on the formation of a hedge fund and the creation of Parsi, Farahi asked

14  Nixon Peabody to prepare a new PPM to raise $30 million.  *Id.* at ¶ 29 (alleging that

15  the work was requested in September, 2008).  In fact, that work had begun in 2007

16  and proceeded through March, 2008, before apparently temporarily ceasing.

17  *Source:*  March 24, 2008 email from Tamman to Farahi.

18      39.     Upon learning of the losses generated by Farahi, Nixon Peabody

19  concluded that NewPoint could create a new offering and use the proceeds of that

20  offering to fund losses from the prior offerings, as long as proper disclosures were

21  made.  *Sources:* Email exchange between November 20 and December 4, 2008

22  among Carolyn Nussbaum, Tamman and Farahi; Tamman Complaint, ¶ 36.  It was

23  not until several months later, as alleged in paragraph 44, below, that any Nixon

24  Peabody partner expressed any level of concern about the issue.

25      40.     On October 30, 2008, associate Matt Grazier prepared a supplement to

26  what he descried as the "Offering Memorandum dated October 31, 2008."  *Source:*

27  October 30, 2008 email from Matthew Grazier to Tamman.  The proposed

28  supplement disclosed the following (blank spaces in original):

ERVIN COHEN & JESSUP LLP

ERVIN COHEN & JESSUP LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"The Company has experienced significant losses in the last 60 days due in part to current negative market conditions and there can be no assurance that such market conditions will improve in the foreseeable future. On _____, 2008, the Company had $__ million in total assets, and on _____, 2008, the Company had $__ million in total assets."

*Id.* On November 3, 2008, Amouei again sent Nixon Peabody the PPM originally used by NewPoint to sell debentures. *Source:* November 3, 2008 email from Amouei to Tamman. Consistent with the documents previously sent to Nixon Peabody, this PPM specifically stated that the proceeds of the offering would not be used to purchase securities.

41. On November 5, 2008, Mr. Grazier produced a revised PPM containing substantially the same language used in the supplement he prepared on October 30, 2008. The new PPM contained an offering date of "November __, 2008." *Source:* November 5, 2008 email from Matt Grazier to Tamman. The revised PPM also disclosed that the proceeds of the new offering "may also be use [sic] to pay interest and repay principal on the Company's existing indebtedness (including debentures previously sold by the Company)." *Id.*

42. Tamman claims that he did not know that the losses suffered by NewPoint were, in fact, incurred in Farahi's personal brokerage account. Tamman alleges that he did not learn that information until March, 2009. *Source:* Tamman Complaint, ¶ 33. So, for more than four months, Nixon Peabody was working on a PPM to raise new funds – earmarked to be used to repay losses suffered on existing investments – without knowing anything about how those losses were incurred.

43. It also appears that Tamman knew earlier than he admits that the losses arose out of activities that were inconsistent with the existing PPMs. On January 27, 2009, Tamman sent a revised PPM draft to Farahi. The cover email cryptically contains the following statement: "during our last meeting you mentioned that there were some issues that needed to be addressed relating to the 2008 financials."

ERVIN COHEN & JESSUP LLP

1   *Source:* January 27, 2009 email from Tamman to Farahi.  The enclosed PPM,

2   however, sheds additional light on what Tamman did know.  Under the heading

3   "Estimated Use of Proceeds" the PPM identifies four uses, one of which is:

4   "Investments and Capital Expenditures."  Prior PPM's referred to "Investments."

5   But in earlier PPM's, a footnote to the Investments entry stated that proceeds would

6   not be invested in securities.  In the PPM attached to the January 27, 2009 email, the

7   footnote appended to the term "Investments and Capital Expenditures" says:

8   "Investments and Capital Expenditures include but are not limited to real estate,

9   futures trading, unsecured assets, business interests, debt and other instruments and

10  assets." *Id.*  This change strongly infers that Farahi had disclosed the reasons for his

11  trading losses by no later than January, 2009.

12      44.     Even before March 2009, when Tamman claims he first learned that

13  Farahi's losses, partially covered by NewPoint funds, arose from trading in Farahi's

14  personal investment accounts, Nixon Peabody partner Deborah McLean knew

15  something was wrong.  She wrote:

16          "Carolyn [Nussbaum (Nixon Peabody partner)] asked a month or

17          so ago if, in an on gong private placement of debentures the new

18          proceeds could be used to pay p&i on the old ones.  All

19          accredited.  I said that while it smelled, with adequate disclosure

20          of the intention to do so, I guessed one could.  David just

21          reminded me of this.  Now I guess he wants someone to do a

22          quick read of the offering memo to see if there are obvious

23          disclosure gaps and then talk to the client about it.  The client has

24          an affinity in the Iranian community in L.A.  I am afraid I cross-

25          examined David about the client.  Other than to say that he (John

26          and Gissou Farahi) is subject to FINRA as a registered broker

27          dealer, he didn't seem to know much although he has represented

28          him for a while.  He assumes that there will be audited financials

ERVIN COHEN & JESSUP LLP

1   to accompany the PPM although he wasn't sure and didn't know

2   who the auditor was. *He has done no diligence on the client – no*

3   *searches for enforcement actions, etc.  Doesn't feel right to me*

4   *and I am really not in a position, this week or next to review this*

5   *– looks to me like it may need a lot of work."*

6   *Source:* February 13, 2009 email from Deborah McLean to John Partigan (emphasis

7   added).

8       45.    Ms. McLean framed the problem well.  Tamman either knew nothing

9   about his client or disclosed nothing to his fellow partners.  Instead, he simply did

10  the bidding of non-client Farahi.  While he did so, Farahi lost more than $30 million

11  trading options through a brokerage account in his wife's name.  *Source:*

12  Superseding Indictment, ¶¶7(e), (g).  By his own admission, Farahi diverted

13  between $7 million and $11 million in NewPoint funds to cover some of those

14  losses.  *Source:* Tamman Complaint, ¶¶ 30, 33.  Had Tamman and his Nixon

15  Peabody partners acted in the interests of their client when, in 2007 they had

16  available to them sufficient information to call into question Farahi's management

17  of their client, they could have stopped most of the significant losses incurred by

18  NewPoint and avoided the significant additional losses that deepened NewPoint's

19  insolvency.

20      46.    According to Tamman, in a meeting held in March, 2009, Nixon

21  Peabody partner William Kelly advised Tamman that, in light of the losses caused

22  by previously undisclosed loans to Farahi, investors needed to be advised of their

23  right to rescind.  *Source:* Tamman Complaint, ¶ 33.  As with McLean's dire

24  warnings, there is no evidence that Nixon Peabody ever took any action on Kelly's

25  conclusion that NewPoint should offer rescission to its investors.

26      **D.    Nixon Peabody Attempts to Conceal Farahi's Embezzlement.**

27      47.    Nixon Peabody further cemented its role as counsel to Farahi and

28  adverse to its client NewPoint when, in April 2009, Nixon Peabody began assisting

1  NewPoint and Farahi to respond to an SEC subpoena.

2      48.   On April 13, 2009, Farahi contacted Tamman to discuss the fact that

3  the SEC had appeared at NewPoint's office to conduct an audit. *Source:* Tamman

4  Complaint, ¶ 36.

5      49.   In his complaint, Tamman claims to have been under the impression

6  that the audit was routine, but on that same day, Tamman sent an email to associate

7  Matthew Grazier to ask him to prepare "an unsecured revolving promissory note

8  whereby John Farahi is borrowing money from NewPoint Financial Services, Inc."

9  *Source:* April 13, 2009 email exchange between Tamman and Matthew Grazier.

10  Grazier prepared the note, leaving the dollar amount blank and dating it April __,

11  2009. *Id.* That same evening (April 13, 2009), Tamman sent the promissory note to

12  Farahi. *Source:* April 13, 2009 (7:02 p.m.) email from Tamman to Farahi.

13  However, while leaving the blanks from Grazier's draft where the dollar amounts

14  were to be inserted, Tamman back-dated the note from "April __, 2009" to "October

15  1, 2008." The only interpretation of this conduct is that Tamman was attempting to

16  assist Farahi to conceal his embezzlement of funds from NewPoint.[5] Ironically, ten

17  days earlier, Tamman sent Farahi another revision to the PPM. This one added a

18  disclosure that Farahi had borrowed funds from NewPoint, but it claimed that Farahi

19  had borrowed the funds under a promissory note dated "March __, 2009." *Source:*

20  _____

21  [5]  In what can only be described as a frenzied email exchange on May 12, 2009,
22  Tamman urgently asked his secretary for a copy of the promissory note.
    When she was unable to locate it, he responded: "Its [sic] not a secured
23  document, helpdesk will not help you find it." *Source:* May 12, 2009 email
    exchange between Tamman and Darlene Dorian. Tamman appears to be
24  saying that he did not save the amended promissory note on the firm network,
    and that appears to be correct, because it does not appear in any of the
25  network documents produced by Nixon Peabody. The Nixon Peabody billing
    records indicate that three Nixon Peabody partners – Tamman, Mr.
26  O'Callaghan and Ms. Miller – all were involved in conferences with Farahi
27  concerning the SEC investigation on May 12.

28

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, NEGLIGENCE AND CONSTRUCTIVE FRAUD

ERVIN COHEN & JESSUP LLP

1   April 3, 2009 email from Tamman to Farahi.

2       50.    Nixon Peabody's invoices to NewPoint indicate that on April 13, 2009,

3   Tamman spent 3.2 hours on the following description: "Meet with client.  Various

4   compliance issues."  Nixon Peabody partner William Kelly's time records show that

5   he was also involved in counseling Farahi on April 13.  He charged 2.1 hours that

6   day with the following description:  "Conference call with D. Tamman and J. Farahi

7   and individual telephone calls with Messrs Tamman and Farahi regarding SEC audit

8   of broker dealer.  Advice regarding disclosure of affiliates' business activities.

9   Review Private Placement Memorandum and proposed revisions thereto." *Source:*

10  May 20, 2009 Nixon Peabody invoice (matter no. 5).  Tamman billed an additional

11  1.3 hours (under matter 1) to "Review promissory note."  Although the emails cited

12  above show that Tamman revised the note by back-dating it, his time entry omits

13  mention of revising the note. *Source:*  May 20, 2009 Nixon Peabody invoice

14  (matter no. 1).

15      51.    At this point, Nixon Peabody had generated numerous drafts of a new

16  PPM for NewPoint – a process that should have raised concerns about (or at least

17  led to a review of) the propriety of NewPoint's use of Rule 506 or any Reg. D

18  exemption.  Nixon Peabody was also aware that Farahi had lost millions of dollars

19  in NewPoint funds by trading those funds out of his personal account.  Partner

20  Deborah McLean had already raised internal red flags; and partner William Kelly

21  suggested that Farahi's trading losses might require NewPoint to offer rescission to

22  its investors.  Rather than recognize the conflict inherent in its position, Nixon

23  Peabody said nothing, made no apparent effort to alert NewPoint's compliance

24  officer, and instead aggressively pursued the representation of NewPoint in

25  connection with the SEC investigation.[6]

26

27  _____

28  [6]    In fact, on May 26, 2009, Nixon Peabody even spoke to Farahi about
        (footnote continued)

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, NEGLIGENCE AND CONSTRUCTIVE FRAUD

ERVIN COHEN & JESSUP LLP

52.    So interested in the billings that an extensive SEC investigation could generate, in an email dated April 28, 2009, Nixon Peabody partner Ed O'Callaghan requested permission to fly from New York to Los Angeles to attempt to secure the conflicted representation of Farahi and NewPoint:

> A client of David Tamman's, Newpoint Financial *and its owner*
> *John Farahi*, are under SEC OCIE audit/investigation in LA.
> I've had a couple of long calls with the client and David. The
> client is in the process of producing requested items to the SEC.
> And he has indicated that he wants a white collar attorney
> involved at this point. He is talking about going to another firm
> because we do not have a white collar person in the LA office.
> David Tamman, Phil Taub and Dave Vicinanzo think it would be
> best if I fly out there and meet the client Wednesday. They know
> that Anjali is out there, but since I have had a couple of long
> conversations with him, they think it best if I go. This
> investigation is not going away any time soon, and we'd like to
> keep it here. I told them I was willing to go so long as I could
> clear other matters. I know you wanted to try to meet with Josh
> tomorrow afternoon. I think that the LA matter is in a little more
> crisis mode right now and we'd hate to lose a client on a matter in
> our wheelhouse.

---

providing him with estate planning advice. *Source*: 5/26/09 email from O'Callaghan to Tamman ("I spoke to Mark Berman about the estate planning issues and he asked that we ask John for a host of documents related to his holdings."). Knowing that non-client Farahi had embezzled millions of dollars from its client (NewPoint), it appears that Nixon Peabody was so interested in generating additional fees that it offered to provide Farahi with legal advice to help keep that embezzled money safe from creditors.

ERVIN COHEN & JESSUP LLP

1  *Source:* April 28, 2009 email from Edward O'Callaghan to Laurie Miller (emphasis

2  added).

3      53.    On April 30, 2009, Nixon Peabody wrote off a $4,300 accounts

4  receivable from NewPoint as a further inducement to obtain the SEC representation.

5  *Source:* April 30, 2009 email exchange among, *inter alia,* Tamman, Philip Taub and

6  James Black.

7      54.    Between April and August, 2009, Nixon Peabody billed NewPoint

8  more than $115,000 for its work in connection with the SEC investigation.  Among

9  the "services" provided were Nixon Peabody's deliberate efforts to mislead the

10  SEC.

11      55.    In addition to the above-described preparation of a fraudulent back-

12  dated promissory note, on July 16, 2009 Nixon Peabody attorney Tamman provided

13  to Sylvia Scott[7] copies of what he claimed were the final versions of the NewPoint

14  PPMs (claiming that "we have been advised by our client" that the documents were

15  the final versions).  Tamman included two versions of the May 1, 2003 PPM and

16  one PPM dated October 1, 2008.  *Sources:*  July 16, 2009 emails between Sylvia

17  Scott and Tamman.

18      56.    Plaintiff is informed and believes, and thereon alleges that Nixon

19  Peabody presently claims that it never completed work on the October 1, 2008 PPM,

20  and it never authorized use of that document.  Thus, either Tamman's

21  characterization of the 2008 PPM as final was intentionally misleading or Nixon

22

23  [7]  Sylvia Scott is a partner with Freeman, Freeman & Smiley, LLP ("Freeman").
    In a July 28, 2009 letter to Nixon Peabody, Freeman identified itself as
24  counsel to John Farahi, NewPoint, and NewPoint Securities, LLC.  *Source:*
    July 28, 2009 letter from Sylvia Scott to Tamman.  On July 27,  Farahi sent
25  Nixon Peabody a letter requesting the release of its client files to Freeman.
26  Plaintiff does not know Freeman's precise role on July 16, 2009, except that
    Plaintiff does know that Freeman was, at a minimum, retained to assist
27  NewPoint to respond to the SEC's subpoena.

28

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, NEGLIGENCE AND CONSTRUCTIVE FRAUD

ERVIN COHEN & JESSUP LLP

1  Peabody's present position that it never completed work on that document is untrue.

2      57.    Tamman's conduct concerning production of the 2003 PPMs was far

3  more egregious.  Tamman knew what the final versions of the 2003 PPMs looked

4  like.  As alleged above, in August, 2004, he had revised the original PPM to change

5  the offer closing date and make other changes – possibly knowing that the revisions

6  were being used by Farahi to mislead FINRA.  *Sources:* March 21, 2007 email from

7  Tamman to Chen-Drake; Superseding Indictment, ¶¶ 25, 26.  Furthermore, on two

8  separate occasions, Amouei had emailed Tamman copies of the PPMs that

9  NewPoint said it had used.  *Sources:* March 12, 2007 and November 3, 2008 emails

10  from Amouei to Tamman.  Yet, Tamman did not simply forward Amouei's emails

11  to Sylvia Scott.

12      58.    Instead, Tamman made material alterations to the 2003 PPMs and then

13  sent them to Sylvia Scott, for production to the SEC, claiming that the documents

14  were, to the best of Tamman's knowledge, the final versions.  Among the material

15  alterations Tamman made were the following:

16      A.  Tamman revised a sentence in the use of proceeds as indicated by

17      the strike-through: "The proceeds of the Offering shall not be used in

18      connection with ~~the purchase and sale of securities, nor shall they be~~

19      ~~used in connection with~~ NewPoint securities, LLC."

20      B.  Tamman inserted the following section which did not appear

21      anywhere in the actual 2003 PPMs:

22      **"Concentration of Assets; Use of Proceeds**

23          "Company holds an unsecured revolving promissory note

24      from the Company's President and Chief Executive Officer, John
    Farahi.  Mr. Farahi has made various investments with the

25      proceeds loaned to him.  The Company also intends, from time

26      to time, to loan additional funds from the proceeds received in
    the Offering to Mr. Farahi which he intends use [sic] to make

27      additional investments.  The Company's ability to collect

28      amounts due from Mr. Farahi will be dependent on the success of

ERVIN COHEN & JESSUP LLP

ERVIN COHEN & JESSUP LLP

1    Mr. Farahi's personal investments."

2    C.    Tamman inserted similar language under the heading titled "Use

3    of Proceeds may be Altered," adding the phrase "including unsecured

4    loans to the Company's President and Chief Executive Officer the

5    proceeds of which will be invested in accordance with the strategies

6    described in this Memorandum."

7    D.    Tamman altered a chart depicting "Estimated Use of Proceeds"

8    by adding a "Use," labeled "Loans to John Farahi," fixing that use at $6

9    million, and reducing the other listed uses to account for the $6 million

10   reallocated to the newly-added "Loans to John Farahi" entry.  Tamman

11   also altered a footnote in that same chart by **deleting** the sentence:

12   "Proceeds will not be used for investments in securities."

13   E.    Apparently recognizing its impact on NewPoint's claimed Reg.

14   D exemption, Tamman deleted a sentence under the "Strategy" heading

15   that read:  "The process of creating name brand recognition has been

16   done through community based ethnic media including television, the

17   Internet, radio and print media."

18   F.    Tamman removed a statement that the debentures would only be

19   sold to accredited investors by making the following alteration:

20   "NewPoint Financial Services, Inc., a Nevada corporation (the

21   "Company") is offering an aggregate of $20,000,000 in Tiered Variable

22   Interest Rate Subordinated Debentures (the "Debentures") ~~to~~

23   ~~Accredited Investors, as that term is defined in Rule 501 promulgated~~

24   ~~under the Securities Act of 1933, as amended (the "1933 Act")~~."

25   G.    Tamman **removed** the following sentence:  "These Debentures

26   are suitable for investment only by prospective investors who meet the

27   qualifications of an 'Accredited Investor,' as defined in Regulation D

28   promulgated under the 1933 Act, as described below under 'Investor

13390.10:1602511.1

23

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, NEGLIGENCE AND CONSTRUCTIVE FRAUD

1    Suitability Standards.'"'

2 Other alterations were also made, all of which appear designed to insert supposed

3 disclosures that loans would be made to Farahi, and to remove statements that

4 proceeds would not be invested in securities, and that the offering would only be

5 made available to Accredited Investors.

6    59.    The foregoing illustrates that Nixon Peabody knew that it was

7 promoting, protecting, aiding and abetting the misappropriation of NewPoint funds

8 by Farahi.  Tamman knew exactly how to attempt to alter history by creating a back-

9 dated promissory note and preparing counterfeit PPMs to make it appear that the

10 PPM's disclosed that Farahi would take loans from NewPoint and use the proceeds

11 to invest in securities.  Nixon Peabody's conduct could not have been further from

12 fulfilling its fiduciary duties to NewPoint.  Nixon Peabody had evidence that a crime

13 had been committed against its client by Farahi; it responded by fabricating

14 evidence to conceal the crime.

15    60.    The foregoing factual allegations are incorporated into, and form the

16 basis for the causes of action alleged hereinbelow.

**CLAIMS FOR RELIEF**

**COUNT ONE**

**(BREACH OF FIDUCIARY DUTY)**

20    61.    Plaintiff incorporates herein, as if set forth in full, paragraphs 1 through

21 59, inclusive.

22    62.    Nixon Peabody was engaged solely by NewPoint to act solely in the

23 best interests of NewPoint.  As counsel to NewPoint, Nixon Peabody owed a

24 fiduciary duty to NewPoint to act in NewPoint's best interests, even at Nixon

25 Peabody's peril.

26    63.    Nixon Peabody repeatedly breached its fiduciary duties to NewPoint

27 by, *inter alia*: (i) aiding and abetting Farahi to embezzle NewPoint funds; (ii)

28 attempting to cover up Farahi's embezzlement by generating forged documents

*ERVIN COHEN & JESSUP* LLP

1  consisting of a forged promissory note and forged PPMs; (iii) failing to properly

2  advise NewPoint on the federal securities laws, including the fact that its debentures

3  did not qualify for exemption under Reg. D, and instead choosing to actively

4  promote securities offerings that Nixon Peabody must have known were made in

5  violation of the federal securities laws; (iv) upon learning that Farahi had embezzled

6  NewPoint funds, failing to take immediate action to protect NewPoint; and (v)

7  entering into multiple conflicted representations in which Nixon Peabody treated

8  Farahi as its client, while Farahi stole millions of dollars from NewPoint accounts.

9      64.    As a result of Nixon Peabody's multiple breaches of its fiduciary

10  duties, NewPoint was damaged because Nixon Peabody's inaction led to the

11  following: (i) it allowed Farahi to loot even more funds from NewPoint; (ii) it

12  caused NewPoint to incur additional liabilities to investors; (iii) it deepened

13  NewPoint's already obvious insolvency; and (iv) it caused or encouraged NewPoint

14  to commit multiple violations of the federal securities laws.

15      65.    Plaintiff's damages are not fully calculated, but consist, at a minimum,

16  of the money Farahi embezzled from NewPoint or pledged to creditors to cover

17  trading losses after Nixon Peabody was fully on notice of the fact that Farahi was

18  misusing NewPoint funds. According to Tamman's verified complaint, Farahi

19  admitted the amount so embezzled was between $7 million and $11 million.

20  *Source: Tamman Complaint, ¶ 30.* The true amount may be significantly higher.

21      66.    In its actions contrary to the best interests of NewPoint and in its

22  multiple failures to act in NewPoint's best interests, Nixon Peabody acted with

23  oppression, fraud, and/or malice, thus entitling plaintiff to the recovery of punitive

24  damages.

25      67.    In doing the acts alleged above, each of the partners, associates,

26  paralegals and employees of Nixon Peabody acted for, at the direction of, and on

27  behalf of Nixon Peabody, and Nixon Peabody is liable for all of their actions and

28  conduct because Nixon Peabody authorized their conduct.  Furthermore, Nixon

ERVIN COHEN & JESSUP LLP

**ERVIN COHEN & JESSUP** LLP

1   Peabody partner Tamman, in acting to conceal Nixon Peabody's prior misconduct,

2   did so in his role as a Nixon Peabody partner, and as such ratified, on behalf of

3   Nixon Peabody, all of the wrongful conduct alleged herein.  Thus, to the extent that

4   Nixon Peabody may contend that some or all of the conduct alleged in this action is

5   attributable to an employee and not a partner or member of the firm, Nixon Peabody

6   is liable for punitive damages as a result of that authorized and ratified conduct.

7   *See,* Cal. Civ. Code § 3294(b).

8                          **COUNT TWO**

9                     **(PROFESSIONAL NEGLIGENCE)**

10       68.   Plaintiff incorporates herein, as if set forth in full, paragraphs 1 through

11  65, inclusive.

12       69.   In acting and failing to act as alleged above, Nixon Peabody fell

13  beneath the standard of care by failing to act with such skill, prudence, and diligence

14  as lawyers of ordinary skill and capacity commonly possess and exercise in the

15  performance of the tasks which they undertake.  Furthermore, by holding itself out

16  as having particular expertise in securities offerings and the federal securities laws,

17  Nixon Peabody also failed  to exercise the skill, prudence, and diligence exercised

18  by other specialists of ordinary skill and capacity specializing in the same field.

19       70.   As a result of Nixon Peabody's negligence, NewPoint has suffered

20  damages as more particularly alleged above.

21                          **COUNT THREE**

22                      **(CONSTRUCTIVE FRAUD)**

23       71.   Plaintiff incorporates herein, as if set forth in full, paragraphs 1 through

24  65, inclusive.

25       72.   A breach of fiduciary duty generally also constitutes constructive fraud.

26  *See, e.g., Salahutdin v. Valley of California, Inc.,* 24 Cal.App.4th 555, 563 (1994).

27       73.   As more particularly alleged in Count One, Nixon Peabody had

28  detailed knowledge of facts demonstrating that Farahi was operating NewPoint

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, NEGLIGENCE AND CONSTRUCTIVE FRAUD

1 improperly and using its funds for his own personal benefit and in a manner

2 inconsistent with the PPMs used to raise funds.

3      74.    By failing to properly advise NewPoint and by, in fact, ignoring the

4 fact that NewPoint, and not Farahi, was the client, Nixon Peabody concealed facts

5 and information that it had a duty to disclose, and instead aided and abetted Farahi

6 as he embezzled corporate funds and wasted corporate assets.

7      75.    In its actions that were contrary to the best interests of NewPoint and in

8 its multiple failures to act in NewPoint's best interests, Nixon Peabody acted with

9 oppression, fraud, and/or malice, thus entitling plaintiff to the recovery of punitive

10 damages.

11      76.    In doing the acts alleged above, each of the partners, associates,

12 paralegals and employees of Nixon Peabody acted for, at the direction of, and on

13 behalf of Nixon Peabody, and Nixon Peabody is liable for all of their actions and

14 conduct because Nixon Peabody authorized their conduct.  Furthermore, Nixon

15 Peabody partner Tamman, in acting to conceal Nixon Peabody's prior misconduct,

16 did so in his role as a Nixon Peabody partner, and as such ratified, on behalf of

17 Nixon Peabody, all of the wrongful conduct alleged herein.  Thus, to the extent that

18 Nixon Peabody may contend that some or all of the conduct alleged in this action is

19 attributable to an employee and not a partner or member of the firm, Nixon Peabody

20 is liable for punitive damages as a result of that authorized and ratified conduct.

21 *See*, Cal. Civ. Code § 3294(b).

22      WHEREFORE, Plaintiff James Donell, as Permanent Receiver of NewPoint

23 Financial Services, Inc., prays for relief as follows:

24      1.    For damages according to proof at trial and expected to exceed $7

25 million;

26      2.    For exemplary or punitive damages as to Counts One and Three;

27      3.    For its costs of suit; and

28

*ERVIN COHEN & JESSUP LLP*

13390.10:1602511.1

27

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, NEGLIGENCE AND CONSTRUCTIVE FRAUD

4.     For such other and further relief as this Court may award.

DATED: May _10_, 2012                    ERVIN COHEN & JESSUP LLP
                                         Byron Z. Moldo
                                         Michael C. Lieb
                                         Faye C. Rasch


                                         By: _____
                                             Michael C. Lieb,
                                             Attorneys for James H. Donell, Permanent
                                             Receiver

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, NEGLIGENCE AND CONSTRUCTIVE FRAUD

1

## **DEMAND FOR JURY TRIAL**

2      Plaintiff respectfully demands a trial by jury on each of the claims alleged

3  herein.

4  DATED: May _10_, 2012          ERVIN COHEN & JESSUP LLP

5                                                 Byron Z. Moldo
                                                   Michael C. Lieb
6                                                 Faye C. Rasch

7

8

9                                   By: _____
                                            Michael C. Lieb,
10                                          Attorneys for James H. Donell, Permanent
                                            Receiver
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ERVIN COHEN & JESSUP LLP

COMPLAINT FOR BREACH OF FIDUCIARY DUTY, NEGLIGENCE AND CONSTRUCTIVE FRAUD

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Consuelo B. Marshall and the assigned discovery Magistrate Judge is Paul Abrams.

The case number on all documents filed with the Court should read as follows:

## CV12- 4084 CBM (PLAx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==========================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[X] Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | **[ ] Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | **[ ] Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

ORIGINAL

Name & Address:
Byron Z. Moldo (SBN 109652)
Michael C. Lieb (SBN 126831)
ERVIN COHEN & JESSUP LLP
9401 Wilshire Boulevard, Ninth Floor
Beverly Hills, CA  90212-2974

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES H. DONELL, a Permanent Receiver for NewPoint Financial Services, Inc.<br><br>PLAINTIFF(S)<br><br>v.<br><br>NIXON PEABODY LLP<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**CV12·4084** CBM (PLAx)<br><br>**SUMMONS** |

TO:  DEFENDANT(S):

A lawsuit has been filed against you.

Within <u>21</u> days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached [X] complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, <u>Michael C. Lieb, Esq.</u> , whose address is <u>Ervin Cohen & Jessup LLP, 9401 Wilshire Blvd., 9th Fl., Beverly Hills, CA  90212</u> . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: <u>MAY 1 0 2012</u>

By: _____

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (10/11                                    **SUMMONS**

CCD-1A

COPY

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| JAMES H. DONELL, a Permanent Receiver for NewPoint Financial Services, Inc. | NIXON PEABODY LLP |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Byron Z. Moldo (SBN 109652)<br>Michael C. Lieb (SBN 126831)<br>ERVIN COHEN & JESSUP LLP<br>9401 Wilshire Blvd., 9th Floor<br>Beverly Hills, CA 90212-2974<br>310-273-6333 | Russel G. Ryan<br>King & Spalding LLP<br>1700 Pennsylvania Avenue, NW<br>Washington, DC 20006<br>202-661-7984 |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☒ MONEY DEMANDED IN COMPLAINT: $ excess of $7 milli

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Breach of fiduciary duty, professional negligence and constructive fraud brought pursuant to the Court's supplemental jurisdiction in connection with Case No. CV 10-0124-DDP (JEMx)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | | ☐ 540 Mandamus/Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE/ PENALTY | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco- mmodations | | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | IMMIGRATION | | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety/Health | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus- Alien Detainee | | ☐ 690 Other | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | ☐ 440 Other Civil Rights | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 871 IRS - Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

CV12·4084

| FOR OFFICE USE ONLY:   Case Number: | |
|---|---|

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)   CIVIL COVER SHEET   Page 1 of 2

CCD-JS44

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  [X] No  [ ] Yes

If yes, list case number(s):

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  [ ] No  [X] Yes

If yes, list case number(s):  CV 10-0124-DDP (JEMx)

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   [X]  A. Arise from the same or closely related transactions, happenings, or events; or

[ ]  B. Call for determination of the same or substantially related or similar questions of law and fact; or

[X]  C. For other reasons would entail substantial duplication of labor if heard by different judges; or

[ ]  D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX.  VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.

[ ]  Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.

[ ]  Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.

Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties

Note: In land condemnation cases, use the location of the tract of land involved

X.  SIGNATURE OF ATTORNEY (OR PRO PER):  _Michael C. Lieb_   Date May 10, 2012

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |