O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JAMES H. DONELL, | ) | Case No. CV 12-04084 DDP (JEMx) |
| | ) | |
| Plaintiff, | ) | **ORDER DENYING DEFENDANT'S MOTION TO DISMISS COMPLAINT** |
| v. | ) | |
| | ) | |
| NIXON PEABODY LLP, | ) | [Docket No. 9] |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Presently before the court is Defendant Nixon Peabody LLP's Motion to Dismiss Complaint ("Motion"). Having reviewed the parties' moving papers and heard oral argument, the court denies the Motion, and adopts the following Order.

**I.   BACKGROUND**

   **A.   SEC Action and Receivership Order**

This action is related to a January 2010 lawsuit that the Securities and Exchange Commission ("SEC") filed against John Farahi ("Farahi"), his corporation NewPoint Financial Services ("NewPoint"), and various other defendants, which is still pending before this court. The SEC accuses Farahi, NewPoint, and the other

///

defendants of defrauding investors, in violation of various federal securities laws.

Pursuant to a joint stipulation by the parties in that action, the court issued a February 2010 Order ("Receivership Order") appointing current Plaintiff James H. Donell ("Receiver") as permanent receiver of NewPoint and various related entities. The Order grants the Receiver "full power over," among other things, all "choses in action . . . belonging to" NewPoint. (Receivership Order at 1.) The Order also authorizes the Receiver "to employ attorneys, accountants and others to investigate, and where appropriate, to institute, pursue, and prosecute all claims and causes of action of whatever kind and nature which may now or hereafter exist as a result of the activities of present or past employees or agents of NewPoint." (Id. at 2.)

**B.   Allegations Against Nixon Peabody**

On May 10, 2012, the Receiver filed the present action against Defendant Nixon Peabody LLP ("Nixon Peabody"), alleging that Nixon Peabody, after being retained by NewPoint, instead helped Farahi "to loot the assets of NewPoint, to cause NewPoint to violate the federal securities laws, and to attempt to conceal Farahi's embezzlement of funds and NewPoint's numerous violations of the federal securities laws." (Compl. ¶ 1.) Based on this alleged misconduct by Nixon Peabody, the Receiver brings state law claims on behalf of NewPoint for breach of fiduciary duty, professional negligence, and constructive fraud. According to the Receiver, these actions damaged Newpoint by: 1) enabling "Farahi to loot even more funds from NewPoint"; 2) causing "NewPoint to incur additional liabilities to investors"; 3) deepening "NewPoint's already obvious

insolvency"; and 4) causing "NewPoint to commit multiple violations of the federal securities laws." (Id. ¶ 64.)

Specifically, the Receiver alleges in his Complaint that attorney David Tamman ("Tamman") started providing legal services to NewPoint in 2003, while working at another law firm. In particular, Tamman had drafted a revised "Private Placement Memorandum" ("PPM") for NewPoint, claiming a "Reg. D" exemption under Rule 506. A Rule 506 exemption requires that an offering be sold to no more than 35 non-accredited investors, all of whom must be "sophisticated investors," as defined by the Rule. The revised PPM also expressly stated that investor funds would not be used to make investments in securities. Farahi, however, filed a "Form D" earlier in 2004, making clear that investor funds would be used for such securities investments. According to the Receiver, Tamman therefore already knew or should have known that Farahi was operating NewPoint in violation of its PPM as of 2004, by improperly investing in securities.[1] The Receiver further alleges that this knowledge can be imputed to Nixon Peabody, once Tamman joined the firm as a partner in February 2007. (Id. ¶¶ 9, 17-21.)

Shortly after joining the firm, Tamman began providing legal services to NewPoint on behalf of Nixon Peabody as well, pursuant to a written retainer agreement. Among other things, in March 2007, Tamman asked an associate to determine whether NewPoint's

---

[1] The Receiver also cites to the First Superseding Indictment in a federal criminal action against Tamman and Farahi. The Indictment alleges that Tamman had revised the original PPM to mislead the Financial Industry Regularity Authority during its 2004 investigation of NewPoint. Among other things, Tamman allegedly added the above-mentioned statement that investor funds would not be used to invest in securities. (Id. ¶ 22.)

3

sale of debentures complied with the Reg. D securities exemptions set forth in Rules 504, 505, and 506.  According to the Receiver, however, Tamman knew or should have known that NewPoint could not qualify for any of these exemptions.  As discussed, the revised PPM that Tamman had prepared at his prior law firm claimed an exemption under Rule 506, which precludes sales to unsophisticated investors.  Tamman, however, received emails on behalf of NewPoint in March and July 2007, which appeared to divide its investors into both "sophisticated" and "<u>not sophisticated</u>" categories.  The Receiver also alleges that Tamman knew or should have known that Farahi was soliciting investments for NewPoint through a Farsi language radio program, which precluded NewPoint from qualifying under <u>any</u> of the Reg. D exemptions.  (<u>Id.</u> ¶¶ 9-21.)

In sum, the Receiver contends that by 2007, Nixon Peabody, through Tamman, knew or should have known that Farahi was improperly operating NewPoint by: 1) making offerings not exempt under Reg. D; and 2) investing in securities, in violation of its PPM.  Thus, according to the Receiver, "if Nixon Peabody had done its job . . ., it would have cut short by two years Farahi's looting of NewPoint Funds, and it would have ended NewPoint's continued violations of federal securities laws."  (<u>Id.</u> ¶ 23.)

The Receiver further alleges that Tamman and Nixon Peabody then continued to work with Farahi, drafting a new PPM and offering.  According to the Receiver, by claiming the same Reg. D exemption when it still clearly did not apply, Nixon Peabody again violated its professional duties.  The new PPM prepared by Nixon Peabody also allegedly provided descriptions of prior debenture

offerings by NewPoint that were contradicted by information previously provided to Nixon Peabody by NewPoint. (Id. ¶¶ 24-33.)

Then, in 2008, Farahi allegedly lost more than $30 million in personal trading, and covered some of those losses using NewPoint funds. According to the Receiver, Nixon Peabody continued assisting Farahi in other ventures, separate from and sometimes in competition with NewPoint, during this time, but billing NewPoint. Nixon Peabody also allegedly learned by late 2008 that Farahi had lost between $7 and $11 million of NewPoint funds. Nixon Peabody then concluded that NewPoint could use a new offering and the proceeds therefrom to cover the losses, so long as it made proper disclosures. Nixon Peabody therefore allegedly continued working on the new PPM and, at the request of Farahi, increased the amount of the offering to $30 million. The new PPM also stated that NewPoint had "experienced significant losses in the last 60 days due in part to current negative market conditions." According to the Receiver, Tamman at least knew or should have known that these losses were inconsistent with the existing PPMs, and likely knew the real reason for the losses - Farahi's personal trading - but no one at Nixon Peabody did any due diligence in investigating the losses. Indeed, another Nixon Peabody partner allegedly expressed concerns at that time that Tamman had "done no diligence on the client." (Id. ¶¶ 34-44.)

Thus, the Receiver contends that by this point: Tamman "either knew nothing about his client or disclosed nothing to his fellow partners. Instead, he simply did the bidding of non-client Farahi. While he did so, . . . Farahi diverted between $7 million and $11 million in NewPoint funds to cover some of [his $30 million

5

in personal] losses." Tamman, himself, also allegedly admits that he knew Farahi's personal investments had caused NewPoint's losses, as of March 2009. According to the Receiver, however, Tamman made no effort to then alert NewPoint's compliance officer of the apparent embezzlement. (Id. ¶¶ 44-45, 51.)

Finally, as things continued to derail, another Nixon Peabody partner allegedly advised Tamman during a March 2009 meeting that: given the losses "caused by previously undisclosed loans to Farahi, investors needed to be advised of their right to rescind." According to the Receiver, however, Nixon Peabody never took any such action to protect NewPoint. Shortly after, in April 2009, Nixon Peabody began assisting Farahi and NewPoint to respond to an SEC investigation. In doing so, Tamman and an associate allegedly prepared a fraudulent "unsecured revolving promissory note," back-dated to October 1, 2008, to conceal Farahi's embezzlement of funds from NewPoint. Similarly, in July 2009, Tamman allegedly provided what he claimed were final versions of various NewPoint PPMs, for production to the SEC. Among other alleged changes, Tamman edited NewPoint's original 2003 PPM by removing statements regarding Reg. D exemptions and that funds would not be invested in securities, and by adding language referring to outstanding loans and permitting additional loans to Farahi. Also in July 2009, Tamman allegedly instructed Nixon Peabody not to produce to the SEC a June 2009 document, in which someone at Nixon Peabody had "asked an associate to research the basic issue of whether the [NewPoint] debentures constituted securities." (Id. ¶¶ 46-58, 24-25.)

Accordingly, the Receiver contends that, in this final stage, Tamman and Nixon Peabody were actively "promoting, protecting,

aiding and abetting the misappropriation of NewPoint funds by Farahi." (Id. ¶ 59; see also id. ("Nixon Peabody had evidence that a crime had been committed against its client by Farahi; it responded by fabricating evidence to conceal the crime.").)

## II. DISCUSSION

In its Motion, Nixon Peabody makes a number of arguments for why the Receiver's Complaint must be dismissed. The court does not find any of these arguments persuasive.

### A. Receivership's Authority

Nixon Peabody first argues that the Receiver lacks authority under the court's Receivership Order to bring the present action, at least without requesting specific permission from the court. The court disagrees. As discussed, the court's Receivership Order expressly authorizes the Receiver to step into the shoes of NewPoint and pursue all causes of action belonging to NewPoint. The court's Order does not require the Receiver to seek authorization from the court prior to bringing any such action.

### B. Constitutional Issues

Nixon Peabody next argues that the Receiver's lawsuit constitutionally violates: 1) the Appointments Clause; 2) Article III and separation of powers principles; and 3) Supreme Court precedent restricting the use of courts' inherent equitable powers. The court does not find any of these arguments convincing.

In making the first two arguments, Nixon Peabody suggests that the Receiver is acting as a prosecutor for the SEC or the court. This is not the case. As discussed, the Receiver is stepping into the shoes of a private party – NewPoint – and pursuing claims against Nixon Peabody that this private party could have brought

itself.  Thus, none of the precedent cited by Nixon Peabody is applicable.

As to the third argument, Nixon Peabody contends that the Receiver's state law tort claims go beyond traditional receiver actions for disgorgement or to "claw back" proceeds from fraudulent schemes.  Nixon Peabody argues that allowing the Receiver to proceed with its claims would therefore exceed the court's inherent equitable powers.  In support of this conclusion, however, Nixon Peabody cites only to the Supreme Court's decision in <u>Grupo Mexicano v. Alliance Bond Fund</u>, 527 U.S. 308 (1999).  There, the Supreme Court held that a federal district court lacked the authority, in an action solely for money damages, to issue a preliminary injunction freezing a defendant's assets.  <u>See</u> <u>id.</u> at 310, 333.  Contrary to Nixon Peabody's argument, <u>Grupo Mexicano</u> is not analogous to the situation here, where the Receiver has been appointed to step into the shoes of NewPoint, and is now pursuing legal claims against Nixon Peabody that NewPoint itself could have brought.

**C.   Subject Matter Jurisdiction**

Nixon Peabody also argues that the court lacks subject matter jurisdiction over the Receiver's action.  The court disagrees.  As the Receiver explains in its Opposition, ancillary jurisdiction is appropriate here under a century of Supreme Court precedent establishing such jurisdiction over all actions "brought by a receiver in furtherance of its appointment where the district court had federal question jurisdiction over the original action in which it appointed the receiver."  <u>Robb Evans & Assocs., LLC v. Holibaugh</u>, 609 F.3d 359, 362 (4th Cir. 2010) (citing <u>Riehle v.</u>

8

Margolies, 279 U.S. 218, 223 (1929); Pope v. Louisville, N.A. & C. Ry. Co., 173 U.S. 573, 577 (1899); and White v. Ewing, 159 U.S. 36, 38-39 (1895)).

In arguing to the contrary, Nixon Peabody relies primarily on the Supreme Court's denial of ancillary jurisdiction in Peacock v. Thomas, 516 U.S. 349 (1996). However, as the Receiver explains, Peacock is wholly inapplicable because, among other things: 1) it "did not involve either a receivership or a claim brought by a receiver"; and 2) because the relevant prior action had already ended, "there was no pending federal action to which plaintiff's action could be deemed ancillary." (Opp'n at 12 (citing Peacock, 516 U.S. at 359).) The Receiver's action here, of course, does involve a receivership and a case still pending in this court to which the instant action is ancillary. The court therefore finds that ancillary jurisdiction is appropriate and that there is subject matter jurisdiction over this action.

**D. Standing**

Next, Nixon Peabody argues that the Receiver lacks standing to pursue this action because NewPoint is simply an "alter ego" of Farahi.[2] In support of this argument, Nixon Peabody cites to Second Circuit cases relying on that Circuit's decision in Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114 (2d Cir. 1991). Under the so-called Wagoner rule, as Nixon Peabody describes it, "a trustee or receiver who 'stands in the shoes' of an entity that was wholly owned and operated by the admitted mastermind and

---

[2] An inference from this argument is that Nixon Peabody knew or arguably should have known that Farahi was so obviously using NewPoint as his personal asset that Nixon Peabody had, at the very least, an obligation to withdraw as NewPoint's counsel.

9

perpetrator of a fraudulent scheme has no standing to sue third parties who allegedly failed to stop the scheme." (Reply at 10.)

As the Receiver explains, however, the Ninth Circuit has never adopted the Wagoner rule, and expressly declined to follow it in an unpublished decision in 2008. See CarrAmerica Realty Corp. v. Nvidia Corp., 302 Fed. App'x. 514, 517 (9th Cir. 2008). As the Ninth Circuit panel also noted, "the Wagoner rule has been much criticized" outside of the Second Circuit. See, e.g., In re Senior Cottages of Am., LLC, 482 F.3d 997, 1003-04 (8th Cir. 2007). Accordingly, the court declines to adopt the Wagoner rule and dismiss the Receiver's action for lack of standing.

### E. Causation

Finally, Nixon Peabody contends that the Receiver has failed to adequately allege causation, "an essential element of each of the Receiver's purported tort claims." (Mot. at 19.) In short, Nixon Peabody argues that the only damages alleged by the Receiver are from Farahi's diversion of NewPoint funds to cover his personal investment losses in 2008. According to Nixon Peabody, the Receiver only alleges that Nixon Peabody learned of this diversion of funds - and then began preparing a new PPM and forging documents - afterwards. Thus, Nixon Peabody could not have had any role in causing this economic loss. The court disagrees.

First, as discussed, the Receiver expressly alleges that Nixon Peabody's unlawful conduct enabled "Farahi to loot even more funds from NewPoint," caused "NewPoint to incur additional liabilities to investors," and deepened "NewPoint's already obvious insolvency." In other words, according to the Receiver's Complaint, NewPoint's economic damages were not limited to a one-time diversion of funds

10

by Farahi. Rather, NewPoint continued to suffer economic harm as a result of Nixon Peabody's alleged failure to then stop and report the ongoing embezzlement - and eventual cover-up efforts - in violation of the firm's professional duties.

Contrary to Nixon Peabody's contentions, the Receiver also expressly alleges that the firm knew or should have known facts that would have prevented or limited Farahi's alleged looting of NewPoint in the first place, and provides sufficient facts to support this allegation. As discussed in detail above, Nixon Peabody partner David Tamman allegedly knew or had reason to know that Farahi was operating NewPoint in violation of its own PPMs and federal securities law, by investing in securities and claiming inapplicable exemptions. According to the Receiver, Nixon Peabody therefore enabled - and played a causal role - in Farahi's later embezzlement, by failing to recognize and stop his already unlawful operations beforehand. The Receiver summarizes these allegations, and the inferences therefrom:

> The complaint contains 25 pages of factual allegations based on identified sources that demonstrate that Nixon attorneys actively assisted Farahi to embezzle funds from NewPoint and then helped him try to cover up his criminal conduct. Nixon did not just engage in an ill-conceived cover-up at a time when the money was already gone. Nixon was hired in March, 2007; immediately looked at whether the NewPoint offerings complied with Reg. D (they did not); and then spent nearly 2½ years providing cover to Farahi while he looted Nixon's client, NewPoint.

(Opp'n at 13.) See Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009) ("In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a

11

claim entitling the plaintiff to relief." (internal quotation marks omitted)).

Accordingly, the court finds that the Receiver has adequately pled the causation element for its tort claims against Nixon Peabody.

### III. CONCLUSION

For all of these reasons, the court hereby DENIES Nixon Peabody's Motion to Dismiss.


IT IS SO ORDERED.


Dated: September 5, 2012

DEAN D. PREGERSON
United States District Judge

12